**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| LINDA REIBENSTEIN, AS THE ADMINISTRATRIX OF THE ESTATE OF MARY ANN WHITMAN, DECEASED | : | No. 32 MAP 2021 |
| | : | |
| | : | Appeal from the Order of the Superior Court at No. 1624 MDA 2019 dated July 30, 2020, reconsideration denied October 5, 2020, Vacating the Order of the Lackawanna County Court of Common Pleas, Civil Division, at No. 2016-01716 dated August 29, 2019 and Remanding. |
| v. | : | |
| | : | |
| CHARLES BARAX, M.D.; AND MERCY HOSPITAL, SCRANTON | : | |
| | : | |
| _____ | : | |
| LINDA REIBENSTEIN, AS THE ADMINISTRATRIX OF THE ESTATE OF MARY ANN WHITMAN, DECEASED | : | ARGUED: October 26, 2021 |
| | : | |
| | : | RESUBMITTED: November 15, 2022 |
| v. | : | |
| | : | |
| | : | |
| PATRICK D. CONABOY, M.D.; AND COGNETTI & CONABOY FAMILY PRACTICE, P.C. | : | |
| | : | |
| | : | |
| APPEAL OF: PATRICK D. CONABOY, M.D. AND COGNETTI & CONABOY FAMILY PRACTICE, P.C. | : | |
| | : | |
| | : | |

**OPINION**

**JUSTICE WECHT**                    **DECIDED: December 12, 2022**

We have long recognized a material distinction between cause and manner of

death, with the former referring to the immediate physiological processes that precipitate

the death of an individual and the latter speaking to the broader context of the surrounding circumstances and events that preceded and contributed to those fatal physiological processes.[1] Here, we consider a similar distinction in a new context—counterposed as medical cause and legal cause—specifically concerning the operation of the statute of limitations for wrongful death and survival actions[2] under the Medical Care Availability and Reduction of Error Act ("MCARE").[3]

MCARE § 513(d) provides that its two-year limitations period on death actions, which commences upon death, will be tolled when there is an affirmative misrepresentation or fraudulent concealment of the cause of death.[4] Appellee Linda Reibenstein undisputedly brought her claims against Appellant Patrick Conaboy, M.D., after the two-year period had run, and the death certificate undisputedly and correctly noted the medical cause of Reibenstein's decedent's death. The trial court ruled that the phrase "cause of death" refers specifically and only to the direct medical cause of death. Accordingly, it granted summary judgment to Dr. Conaboy under Section 513(d). The Superior Court reversed, interpreting "cause of death" more broadly to encompass

---

[1] *See Brenneman v. St. Paul*, 192 A.2d 745, 748-50 (Pa. 1963) (distinguishing the traumatic cause of a fatal injury from the events leading to the traumatic event to determine whether the terms of a life insurance policy had been satisfied).

[2] We primarily refer to these collectively as "death actions."

[3] Act of March 20, 2002, P.L. 154, No. 13, *codified as amended at* 40 P.S. §§ 1303.101-1303.910.

[4] Section 513(d) limits wrongful death and survival actions as follows: "If the claim is brought under 42 Pa.C.S. § 8301 (relating to death action) or 8302 (relating to survival action), the action must be commenced within two years after the death in the absence of affirmative misrepresentation or fraudulent concealment of *the cause of death*." 40 P.S. § 1303.513(d) (emphasis added); *see* 42 Pa.C.S. §§ 8301 (wrongful death action), 8302 (survival action).

considerations associated with the manner of death (*i.e.*, legal cause) in the sense alluded to above.[5] We hold that MCARE's tolling provision cannot bear the breadth of that reading. Accordingly, we reverse.

Decedent Mary Ann Whitman consulted with Dr. Conaboy on April 12, 2010, complaining of a persistent cough, fever, and lower back pain. Dr. Conaboy ordered an aortic duplex ultrasound scan and a CT scan of Whitman's abdominal area, both of which were performed on April 23, 2010. Charles Barax, M.D., a radiologist, reviewed the scans, identifying what he characterized as a poorly visualized aortic aneurysm. Dr. Barax's report indicated that "Dr. Conaboy was contacted with this study [and] was read [*sic*] with the findings" and that the report was provided to Dr. Conaboy.[6] Dr. Conaboy scheduled Whitman to meet with a vascular surgeon on May 10, 2010, but Whitman died when the aneurysm ruptured on April 28, 2010. The parties do not dispute that Whitman's death certificate correctly identified the rupture as her cause of death.

On April 15, 2011, Reibenstein, administratrix of Whitman's estate, brought a wrongful death and survival action against Dr. Barax and Mercy Hospital Scranton (collectively, "Dr. Barax"). The thrust of the suit was that Dr. Barax had misread Whitman's CT scan, failing to recognize the urgency of her condition. As well, Reibenstein contends that she sought unsuccessfully to obtain the certificate of merit that would enable her to name Dr. Conaboy alongside Dr. Barax as a defendant in her original

---

[5] *Reibenstein v. Barax*, 236 A.3d 1162 (Pa. Super. 2020).

[6] Whitman Radiology Report, 4/23/2010, at 2 (attached to Reibenstein's Br. in Opp. to Summ. J., 5/24/2018, Ex. D at 2).

action.[7]  For his part, Dr. Barax filed an answer with new matter, as well as a cross-claim against Mercy Hospital.  However, he made no effort to plead Dr. Conaboy into the litigation.

Discovery progressed, but in fits and starts over several years.  The substance and timing of Dr. Barax's deposition is central to this case.  The trial court indicated that Reibenstein "made several unsuccessful attempts to schedule Dr. Barax's deposition," and that the deposition was taken only after the court intervened.[8]  Dr. Conaboy observes that Reibenstein did not "officially notice" Dr. Barax's deposition until May 22, 2013, well after Section 513(b)'s two-year time limit had run as to Dr. Conaboy.[9]  Three notices followed, with court intervention evidently sought only later in this period, over a year after the first notice was rebuffed.  For her part, Reibenstein observes that she filed requests for written discovery "[i]mmediately after" filing her complaint against Dr. Barax; that it took motions to compel and for sanctions before Dr. Barax responded; and that, "[t]hrough no fault of Ms. Reibenstein, during the course of Dr. Barax's months of obstructionist actions," the statute of limitations expired as to Dr. Conaboy.[10]

Reibenstein finally deposed Dr. Barax nearly five years after Whitman's death, almost four years after filing suit against him.  During that February 2015 deposition, Dr. Barax indicated that he spoke personally with Dr. Conaboy on the day that the CT scan was performed on Whitman.  In that conversation, according to Dr. Barax, he

---

[7]     *See* Reibenstein's Br. at 6.

[8]     Trial Court Opinion Granting Summary Judgment, 10/23/2019, at 2 ("T.C.O.").

[9]     Conaboy's Br. at 7.

[10]    Reibenstein's Br. at 8.

specifically informed Dr. Conaboy both of the presence of an abdominal aortic aneurysm and, importantly, explained that the poor quality of the visualization prevented him from determining whether the aneurysm was rupturing or bleeding.[11] He "further testified that he conveyed to Dr. Conaboy his concerns of a potential rupture."[12]

Based upon this testimony, but over a year after the deposition, on March 1, 2016, Reibenstein filed a new wrongful death and survival action against Dr. Conaboy and his associated practice (collectively, "Dr. Conaboy"), which the trial court consolidated with the Dr. Barax action.[13] This second suit was premised upon Dr. Conaboy's alleged failure to act in light of more detailed information he received in conversation with Dr. Barax, the full substance of which, in Reibenstein's view, was not fully explained in Dr. Conaboy's response to written discovery. Dr. Conaboy ultimately sought summary judgment on the basis that MCARE's statute of limitations for wrongful death and survival actions had long-since run on or about April 28, 2013, almost three years before Reibenstein sued Dr. Conaboy. The trial court heard argument and denied summary judgment, citing *Nicolaou v. Martin*,[14] a case that involved application of the discovery rule[15] to a non-

---

[11] T.C.O. at 2.

[12] Trial Court Opinion Denying Summary Judgment, 11/15/2018, at 2. As explained herein, the trial court first denied Dr. Conaboy's motion for summary judgment only to grant it upon reconsideration—hence the existence of two trial court opinions.

[13] Dr. Barax is not a participant in this appeal.

[14] 195 A.3d 880 (Pa. 2018).

[15] "In certain cases involving latent injury, and/or instances in which the causal connection between an injury and another's conduct is not apparent, the discovery rule may operate to toll the statute of limitations until the plaintiff discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct." *Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009); *see Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) ("[T]he salient point giving rise to [the discovery

death-related claim. In effect, the trial court determined that there were disputed issues of material fact affecting whether the discovery rule rendered Reibenstein's claim against Dr. Conaboy timely. But upon considering Dr. Conaboy's motion for reconsideration, which called particular attention to Section 513(d)'s MCARE-specific statute of limitations for death and survival claims and that section's tolling provision, the court granted summary judgment for Dr. Conaboy. In doing so, the court deemed it "clear" that there "is no evidence of 'affirmative misrepresentation or fraudulent concealment of the cause of death.'"[16]

Reibenstein appealed, and the Superior Court rejected the trial court's reasoning. Section 513, "Statute of repose," provides, in relevant part:

> **(a) General rule.—**Except as provided in subsection (b) or (c), no cause of action asserting a medical professional liability claim may be commenced after seven years from the date of the alleged tort or breach of contract.
>
> * * * *
>
> **(d) Death or survival actions.—**If the claim is brought under 42 Pa.C.S. § 8301 (relating to death action) or 8302 (relating to survival action), the action must be commenced within two years after the death *in the absence of affirmative misrepresentation or fraudulent concealment of the cause of death*.[17]

---

rule's] application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause.").

[16] T.C.O. at 4 (citing *Molineaux v. Reed*, 532 A.2d 792 (Pa. 1987); *Pastierik v. Duquesne Light Co.*, 526 A.2d 323 (Pa. 1987)).

[17] 40 P.S. § 1303.513 (emphasis added). Notwithstanding its titular reference to "repose," we have held that Section 513(d) operates as a statute of limitations. *See Dubose v. Quinlan*, 173 A.3d 634, 647 (Pa. 2017) ("Section 513(d) is a statute of limitations for medical professional liability death cases that sets the date of accrual at the date of decedent's death.").

The Superior Court noted that MCARE's stated purpose "is to ensure . . . that high quality health care is available in the Commonwealth and [to] provide a person who has sustained injury as a result of medical negligence by a health care provider with fair compensation, while controlling the costs of medical malpractice insurance rates."[18] In determining the effect of Section 513(d), the court observed that MCARE itself offered no definition of "cause of death."[19] Dr. Conaboy maintained that the term referred strictly to medical cause of death, *i.e.*, to the direct physical failure or processes that precipitated the patient's death. Reibenstein contended that the phrase should be read also to incorporate the legal cause of death, capturing not only the medical cause of death but also the acts, omissions, or events having some causative connection with the death.

Finding both interpretations reasonable, the court determined that the legislature's chosen language was ambiguous.[20] The court turned to the factors employed in interpreting an ambiguous statute.[21] The court deemed it "clear" that Section 513(d)'s

---

[18] *Reibenstein*, 236 A.3d at 1166. *Compare* "Declaration of Policy," 40 P.S. § 1303.102(3) ("To maintain [a comprehensive and high-quality health care system] medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of this Commonwealth.") *with id.* § 1303.102(4) ("A person who has sustained injury or death as a result of medical negligence by a health care provider must be afforded a prompt determination and fair compensation.").

[19] *Reibenstein*, 236 A.3d. at 1165.

[20] "When the parties read a statute in two different ways and the statutory language is reasonably capable of either construction, the language is ambiguous." *Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016).

[21] *See Reibenstein*, 236 A.3d at 1165-66. The factors include, but are not limited to:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

tolling provision was intended "to protect patients who have pursued their rights, and despite this, 'extraordinary circumstance prevents them from bringing a timely action.'"[22] Where that is the case, the court ventured, the limitations period does not "further the statute's purpose."[23] In the court's opinion, the legislature's choice to include a tolling provision signaled its recognition that

> wrongful death and survival actions may involve situations where the patient's interest in fair compensation outweighs the interest in limiting medical malpractice insurance costs. It is in furtherance of the stated purpose of **fair compensation** that we interpret 'affirmative misrepresentation or fraudulent concealment of the cause of death' to encompass those acts which caused the patient to die. Where a medical practitioner hides an action that was directly related to the cause of the patient's death, the Commonwealth's interest in redress outweighs the interest in control of medical malpractice insurance costs.[24]

Confronted with the competing goals of ensuring fair compensation while working to minimize frivolous litigation and associated increases in insurance premiums, the court determined that the tolling provision should be read as serving the legislature's stated

---

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

[22]    *Reibenstein*, 236 A.3d at 1166 (quoting *Dubose*, 173 A.3d at 645).

[23]    *Id.* (quoting *Dubose*, 173 A.3d at 645).

[24]    *Id.* (emphasis in original).

intention to ensure fair compensation. Thus, the "'affirmative misrepresentation or fraudulent concealment of the cause of death'" tolling provision applied not only to obscurantist conduct in connection with the medical cause of death, but also to "affirmative misrepresentations about or fraudulent concealment of conduct the plaintiff alleges led to the decedent's death."[25]

The Superior Court concluded that the trial court erred when it entered summary judgment on the basis that Whitman's death certificate correctly recorded her medical cause of death. Thus, the appellate court vacated the entry of summary judgment and remanded to the trial court to consider whether "there was a fraudulent concealment or affirmative misrepresentation of an act by Dr. Conaboy related to Mrs. Whitman's death."[26]

We granted Dr. Conaboy's Petition for Allowance of Appeal in order to determine the scope and meaning of the phrase "cause of death" as used in Section 513(d).[27]

---

[25] *Id.* Relatedly, this Court has held that fraudulent concealment "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception." *Fine*, 870 A.2d at 860. However, "[t]he plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." *Id.*

[26] *Reibenstein*, 236 A.3d at 1166-67.

[27] Specifically, we granted review of the following questions:

(1) Whether this Court should rule that "cause of death," as it appears in MCARE's statute of limitation, refers to medical cause of death, and not "conduct leading to death" (or legal cause of death)?

(2) Whether the statute of limitations on a wrongful death or survival act claim may only be tolled under section 513(d) of MCARE where a plaintiff proves that the defendant against whom the claims are asserted (and not a third party) affirmatively misrepresented or fraudulently concealed decedent's cause of death?

Because this is a question of law, we conduct our review *de novo*, and the scope of our review is plenary.[28]

> [O]ur interpretive function requires us to identify the intent of the legislature, and we begin with the presumption that unambiguous statutory language embodies that intent, requiring no further investigation. We may not disregard the Act's unambiguous language in service of what we believe to be the spirit of the law. Furthermore, while we must consider the statutory language in its full context before we assess ambiguity, we must not overlabor to detect or manufacture ambiguity where the language reveals none.[29]

"[W]e should not interpret statutory words in isolation but must read them with reference to the context in which they appear."[30]

The parties' respective arguments run in two tracks. First, each maintains that the other's proposed definition adds language to the statute. We can no more interpret a statute in a way that adds language than we can read it in a way that renders any statutory language ineffective.[31] In the second line of argument, each party proposes that highly unfavorable results that are antithetical to MCARE's purpose and design will follow from ruling in favor of the adversary. We address these arguments in turn.

---

*Reibenstein v. Barax*, 253 A.3d 209 (Pa. 2021) (*per curiam*) (simplified for clarity). Our resolution of the first issue obviates the need to resolve the second.

[28] Allstate Life Ins. Co. v. Commonwealth, 52 A.3d 1077, 1080 (Pa. 2012).

[29] *Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1263-64 (Pa. 2020) (footnotes omitted); *see* 1 Pa.C.S. § 1921(b).

[30] *A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016); *see King v. Burwell*, 576 U.S. 473, 486 (2015) ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions.") (cleaned up).

[31] *See Commonwealth v. Rieck Inv. Corp.*, 213 A.2d 277, 282 (Pa. 1965)) ("[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.").

Dr. Conaboy argues that, in interpreting the statute broadly, the Superior Court effectively added language expanding the scope of the narrow phrase "cause of death":

The Superior Court both *added* and *removed* words from the statute, as shown in brackets and delineation below: "[i]f the claim is brought under 42 Pa.C.S. § 8301 (relating to death action) or 8302 (relating to survival action) the action must be commenced within two years after the death in the absence of affirmative misrepresentation or fraudulent concealment of the [conduct leading to] ~~cause of~~ death."[32]

Reibenstein disagrees, arguing that—far from adding or removing language—the Superior Court merely *interpreted* it. But she also suggests that the adding/subtracting language argument is a double-edged sword. "[Dr. Conaboy is] asking this court to find that 'cause of death' means 'medical cause of death as identified on a death certificate.'"[33] Thus, she contends, Dr. Conaboy's account no less entails the addition of material language to a statute in a way that alters its apparent meaning.

The lack of definition naturally complicates a plain-language analysis, but it hardly precludes one. Among other sources, we may seek common understanding in dictionaries, which furnish insight into shared meaning.[34] And, as we noted in *Sivick*, a contextualized view of a statute also may reveal its meaning without the convenient but unnecessary resort to ambiguity analysis.[35] Such is the case here. The language of Section 513(d) and its statutory context compel the conclusion that "cause of death" should be understood narrowly to encompass only the accuracy of the medical cause of death noted on the certificate of death.

---

[32]     Conaboy's Br. at 18.

[33]     Reibenstein's Br. at 33.

[34]     *See In re Beyer*, 115 A.3d 835, 839 (Pa. 2015).

[35]     *See Sivick*, 238 A.3d at 1264.

Precisely because MCARE encompasses a panoply of interrelated topics, including both tort and quality of care, the most sensible places to seek the meaning of the term "cause of death" are medical contexts in which the General Assembly has used this language—that is, in the Vital Statistics Law and the various County Codes, where cause and manner of death (and their cadences of medical and legal causation) are treated as distinct—especially where those uses unambiguously evoke the medical dictionary definition. For example, Section 507 of the Vital Statistics Law of 1953[36] details circumstances in which a "professional nurse" may *pronounce* a patient's death, notify a coroner, or release the decedent's body to a funeral director. But that limited authority "in no way authorizes a professional nurse to determine the *cause of death*. The responsibility for determining the cause of death remains with the physician, certified registered nurse practitioner or the coroner."[37] The reason for this limitation on a professional nurse's authority, informed by the class of professionals who are not so restricted, is clear: the physician, certified registered nurse practitioner, and coroner— and no one else—are the persons qualified by training and by law to determine the *medical* cause of death. But notably, neither the statute nor common sense suggests that (with the exception of a coroner) they are qualified to speak to the *legal* cause of death.[38]

---

[36]     *See* 35 P.S. §§ 450.101-450-1003.

[37]     *Id.* § 450.507(d) (emphasis added).

[38]     Providers' lack of legal qualifications underscores the risk of broadening the expectations for what physicians must know about the law and share with survivors and investigating counsel in order to retain the benefit of the Section 513(d) statute of limitations. As mentioned *supra* n.26, fraudulent concealment in this context requires no wrongful intent as such. And as the facts of this case suggest, a plaintiff may argue that

Further support for a narrow interpretation of the phrase that distinguishes medical from legal cause of death—much as the law has distinguished cause of death from manner of death—appears in provisions of Pennsylvania's County Code that detail the duties of county coroners, which include investigating "the cause and manner of death" for purposes of determining criminal responsibility "by act or neglect."[39] It is the coroner, rather than a health care provider, whose investigative authority and duties extend beyond the mere physiological mechanism by which death occurred and into the realm of legal causation.[40]

To ensure that references to cause and manner of death are individually effective rather than redundant, we must assume that the legislature intended to impart to them

---

a mere omission by a deponent physician of a detail that a clinician might reasonably think immaterial to a given deposition question is sufficient to trigger tolling under Section 513(d). Justice Mundy would obligate a well-intentioned physician who participated in a given patient's care to record, and later to scour his or her records and memory, not only for what might be relevant in the clinical sense but also what might appear relevant to someone with legal training. Nothing in MCARE suggests that the legislature intended to saddle providers with such a burden.

[39] 16 P.S. § 1219-B(a) ("**Autopsy.—**If, after investigation, the coroner is unable to determine *the cause and manner of death*, the coroner shall perform or order an autopsy on the body." (emphasis added)); *id.* § 1219-B(b) ("**Inquest.—**If the coroner is unable to determine the cause and manner of death following an autopsy, the coroner may conduct an inquest," at which "the coroner's duty shall be to: (1) Ascertain the cause of death. (2) Determine whether an individual other than the deceased was criminally responsible by act or neglect . . . ."); *cf.* 16 P.S. § 9521 ("Coroner to investigate facts in deaths under suspicious circumstances"). Section 1219 is found in the County Code, but materially identical coroner-related provisions are found as well in the Second Class County Code. *See* 16 P.S. §§ 4237-38. Moreover, overarching provisions pertinent to all counties point the same way.

[40] *See, e.g.*, 20 Pa.C.S. § 8657(a) (the Estates Code) ("This section shall apply in all cases when the coroner or medical examiner must determine the cause of death and whether the death may have resulted from criminal acts or criminal neglect.").

distinct meanings.[41]  The only way to do so in the County Code without favoring Dr. Conaboy's argument for a narrow interpretation of "cause of death" in MCARE would be to assume that the legislature intended the term to mean significantly different things in each of those statutes.  Certainly, one can hypothesize contexts in which the legislature so intends.  But we will not presume that to be the case without some quantum of evidence to suggest such intent.  No such evidence appears in this case.[42]

As we observed above, we also may seek guidance in dictionaries.  Dictionaries, too, recognize a cause/manner distinction.  Black's Law Dictionary, for example, defines cause of death as "[t]he happening, occurrence, or condition that makes a person die; the

---

[41]     *See* 1 Pa.C.S. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."); *Ind. Oil & Gas Assn. v. Bd. of Assessment*, 814 A.2d 180, 183 (Pa. 2002) ("Because the legislature is presumed to have intended to avoid mere surplusage, every word, sentence, and provision of a statute must be given effect.").

[42]     With little clarity as to why, Justice Mundy rejects our treatment of the Vital Statistics Law (and, ostensibly, the various county codes, which she does not address) as "context" for interpretive purposes.  Instead, she offers 42 Pa.C.S. § 8301, governing wrongful death actions, one of two provisions cross-referenced in MCARE § 513(d), which, she argues, "shows that the concept of 'cause of death' in wrongful death cases may carry a broader meaning than the immediate physiological processes that precipitate death and may include wrongful acts or neglect that caused death."  Conc. & Diss. Op. at 4 (Mundy, J.).  This is a dubious twist on Section 8301's language, which describes a right of action "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another."  42 Pa.C.S. § 8301.  While this alludes to the cause of death, the full internal context of Section 8301 expressly describes elements of *legal* causation.  Unlike Section 8301, Section 513(d) does not codify a death action, it confines it.  And that Section 8301 includes language clearly describing legal causation underscores that Section 513(d) does not.  In our view, other statutory uses of "cause of death" are more informative than Section 8301's use of similar phrasing, which is modified by a clear description of legal causation absent from Section 513(d).  That Section 513(d) cross-references Section 8301 does nothing more than identify the scope of Section 513(d)'s application.

injury, disease, or medical complication that results directly in someone's demise."[43]  In isolation, "happening, occurrence, or condition" might hint at a broader inquiry than medical cause, but only in isolation.  The more limited reference to "injury, disease, or medical complication"—with its suggestive use of the word "directly," which implies "but-for" causation—critically narrows the scope of the definition.  Dorland's Medical Dictionary offers an equally strict definition of cause of death as "the injury or disease responsible for death."[44]  And our constrained reading of "cause of death" in harmony with these dictionaries finds more support in the same dictionaries' respective definitions of manner of death.  Black's, for example, defines manner of death as "[t]he circumstances under which the cause of death arose,"[45] which jibes perfectly with Dorland's definition: "the circumstances under which a death occurs, *e.g.*, suicide or accident."[46]

In sum then, the available textual evidence, especially viewed in light of broader statutory context and the common usage reflected in reliable reference resources, favors Dr. Conaboy's narrower construction.[47]  The analysis also supports his contention that to

---

[43]     *Cause of death*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[44]     *Cause of death*, DORLAND'S MEDICAL DICTIONARY ONLINE, *available at* https://www.dorlandsonline.com/dorland/definition?id=63759.

[45]     *Manner of death*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[46]     *Manner of death*, DORLAND'S MEDICAL DICTIONARY ONLINE, *available at* https://www.dorlandsonline.com/dorland/definition?id=87900.

[47]     Presumably, physicians and certified registered nurse practitioners do not consult legal dictionaries in order to discern their professional functions and responsibilities.  They may not consult medical dictionaries, either.  But if these medical personnel were to look anywhere, medical references, as well as statutes imposing parameters upon their responsibilities when a patient dies, would be more likely destinations than a dictionary of legal terms.  And so a medical dictionary is an appropriate resource in the search for a contextually common understanding of the terms here at issue.

read "cause of death" as encompassing legal causation or manner of death would entail inserting language into the statute, an enterprise in which we are not free to engage.[48]

The foregoing analysis, sufficient in itself to compel our conclusion, also harmonizes with our pre-MCARE decision in *Pastierik*. In that case, the decedent died of lung carcinoma, and, over three years later, the plaintiff filed two complaints against defendants alleging that the decedent's cancer was caused by workplace exposure to asbestos—the first against decedent's employer, and the second against an alleged supplier of the asbestos. Although decedent died in April 1978, the plaintiff contended that she did not know until March 1981 that asbestos exposure caused her husband's death, hence the discovery rule applied to render her suits timely even though they were filed more than two years after the decedent's death. The trial court found both of the plaintiff's suits barred on the basis that the statute of limitations began to run upon death. The Superior Court reversed, holding that the discovery rule applied.

On appeal, this Court rejected the Superior Court's application of the discovery rule to a death action. The *Pastierik* Court recognized that the typical circumstances that call for resort to the discovery rule do not, indeed cannot, apply to death actions, explaining:

> Statutory references to the occurrence of an "injury" or the accrual of a "cause of action" are subject to judicial interpretation as to the degree of knowledge a plaintiff must possess before the statute will start to run. In contrast, the requirement that a wrongful death action be brought within a

---

[48] *See Rieck Inv. Corp.*, 213 A.2d at 282 ("[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.").

specified number of years after a *definitely established event,—"death"—leaves no room for construction.*[49]

The discovery rule applies when critical information about an injury eludes detection through no lack of diligence on the plaintiff's part, and the "discovery" of that information accordingly dictates when a claim accrues and the limitations period begins to run. But when potential malpractice leads to death, there is no question that injury has occurred—death alone is a signal event, a sufficient impetus to investigate the prospect of malpractice diligently.[50]

Even before MCARE's enactment, that principle was subject to an equitable exception. Then (under the common law) as now (under MCARE), where "cause of

---

[49] *Pastierik*, 526 A.2d at 325 (quoting *Anthony v. Koppers Co.*, 436 A.2d 181, 184 (Pa. 1981)) (*Pastierik*'s emphasis; cleaned up). In *Wilson*, 964 A.2d 354, this Court conducted a thorough survey of how Pennsylvania courts and courts in other jurisdictions have interpreted claim accrual in discovery rule situations, which run the gamut from the point at which the plaintiff knew or should have known that she was injured all the way to when the plaintiff knew or should have known that she was injured, *and* knew that a claim might lie, *and* knew something about who caused the harm. We made clear in *Wilson* that our history was consistent with "the narrower of the two overarching approaches to determining accrual for limitations purposes." 964 A.2d at 364. We further observed that the 2005 edition of Pennsylvania's Suggested Standard Civil Jury Instructions found accrual occurred when "the plaintiff could have first reasonably discovered [his or her] injuries and that it [*sic*] was caused by the conduct of another person"—but not, notably, a *specific* person. *Id.* at 365 (citation omitted).

[50] At times, the *Pastierik* Court seemed to question whether "accrual," as such, is a relevant concept in death actions: "[W]hile the concept of accrual may have usefulness in delaying the point at which the statute of limitations begins to run with respect to injuries, . . . because injuries are of a nature that they may be inflicted without immediate symptoms or immediately determinable causes, causes of action for death must be regarded in a different light since they are not similarly shrouded by indefinite factors." 526 A.2d at 326. But later, in *Dubose*, this Court applied the concept of accrual to death actions: "Section 513(d) is a statute of limitations for medical professional liability death cases that sets *the date of accrual* at the date of decedent's death." 173 A.3d at 647 (emphasis added).

death" was obscure to a potential plaintiff due to an act or omission, estoppel principles compelled tolling the two-year statute of limitations. But the tolling remedy for death claims was more limited than the broader discovery rule for precisely the same reason—death invites immediate investigation.[51]

To be sure, the discovery rule and equitable tolling are conceptually distinct. In discovery-rule cases, claims accrue only upon discovery of the injury and its cause, while the equivalent of accrual in death cases happens upon death as a matter of course. But the statute of limitations will be tolled when the cause of death is obscured by some affirmative act or omission that lulled the plaintiff into neglecting his or her duty to investigate to determine whether there was an actionable claim in malpractice.[52]

That distinction, though, lacks a difference when it comes to the concerns implicated by the question that this case presents. The discovery rule begins to run upon the discovery of injury and the prospect that it was caused by malpractice (if not, as explained immediately above, necessarily *whose* malpractice). But once the claim accrues, the clock ticks inexorably, no matter how difficult it may be to trace that injury back to a tortious act. Even on the broadest available reading of our discovery-rule jurisprudence, the statute of limitations begins to run—at the latest—once one discovers an injury, its cause, and an agent of the harm. And there is no assurance that some

---

[51]   *Pastierik*, 526 A.2d at 325-26; *see* 42 Pa.C.S. § 5502 (relating to the method of computing limitations periods).

[52]   *See Molineaux*, 532 A.2d at 794 ("Where, through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." (cleaned up)).

additional reprieve from the passage of that time will apply where, during the course of litigation, a second potentially liable party enters the picture.

In death actions, death itself is the watershed event, analogous to satisfying the discovery-of-injury and tortious-causation requirements relative to the discovery rule. So it is upon death that any potential claim accrues, triggering a would-be plaintiff's duty of inquiry. What follows in either case may be a frustrating, uncertain investigation, which may yield insufficient evidence of malpractice even where it has occurred. And as noted in one form above, one of the problems that Reibenstein claims in this case—that identifying a responsible party may not occur in the discovery process until after the statute of limitations has run against that responsible party[53]—may occur in a non-death case. The fact remains, though, that the triggering event for the discovery rule is the discovery of injury and the prospect that it was caused by malpractice itself, not the certain discovery of all responsible parties. Naturally, the average injured party or survivor may not be equipped to assess quality of care, the presence of treatment alternatives, or other considerations relevant to the presence or absence of a viable malpractice claim. But the critical consideration is "inquiry notice" and the duty of diligent inquiry that follows: in most cases, it is uncertainty or specific concerns, based perhaps on a review of medical records or the content of interactions with treating health care providers, that will raise a potential plaintiff's suspicions. Beyond that, it is likely that further appraisals will require the involvement of an attorney and/or outside expert review.[54]

---

[53] *See* Reibenstein's Br. at 9, 35.

[54] Justice Mundy maintains that, "[w]hen [concealment or misrepresentation regarding a legal cause of death] is present, the Majority eliminates the remedy of equitable tolling." *See* Conc. & Diss. Op. at 8 (Mundy, J.). While Justice Mundy is correct

What matters is the point in time at which the injured party or survivor has sufficient information to recognize that the matter warrants further pursuit. The aim is to ensure that a veil of total ignorance impenetrable by mere diligent effort does not result in the loss of a meritorious claim.[55] It is not to guarantee that all of the information necessary to sustain a claim will be gathered in the limitations period that commences upon that discovery. At some point the clock must run out, lest health care providers remain subject to liability exposure indefinitely, with the prospect of a trial marred by the death or diminished memory of material witnesses or the loss of critical evidence.[56] And this

_____

regarding the consequence of this ruling, she imputes responsibility to this Court when it properly lies with the General Assembly, which chose the language that we interpret. To the extent that Justice Mundy implies that we eliminate the intended benefit of equitable tolling, we have no trouble identifying scenarios in which such tolling (and its benefits) would apply. For example, a provider might misrepresent a medical cause of death to align with a decedent's pre-existing medical condition, leading a survivor (or, at least as importantly, a lawyer or expert reviewing the decedent's file) to conclude that the death reflected a natural progression of that known condition. Where that assessment obscures a true medical cause of death that is less readily reconciled with the decedent's condition and presentation at the time of treatment, the misidentification may undermine a survivor's inclination to investigate whether negligence contributed to the decedent's death, or may lead reviewing professionals to overlook evidence of negligence. Simply put, the intended benefit of equitable tolling is not rendered illusory merely because the domain of the remedy is limited.

[55]     *See Pastierik*, 526 A.2d at 326 ("Upon the death of an individual, survivors are put on clear notice thereof, and they have the opportunity to proceed with scientific examinations aimed at determining the exact cause of death so that a wrongful death action, if warranted, can be filed without additional delay.")

[56]     *See, e.g., Johnson v. Stuenzi*, 696 A.2d 237, 242 (Pa. Super. 1997) ("The limitations of actions period represents a balancing of interests between an allegedly aggrieved party and the alleged wrongdoer. Fairness requires that an individual who believes he has been wronged have a sufficient period of time to recover from his injury, if any, investigate the circumstances surrounding a potential claim and decide whether legal action is warranted. On the other side of the equation, it is recognized that individuals should not be subjected to claims so remote in time that defending against them will be greatly hampered and, further, that people should be free to live their lives

increased uncertainty will be priced into malpractice insurance premiums, precisely the circumstance MCARE was designed to mitigate.[57]

Reibenstein warns that the narrower account of "cause of death" would encourage conspiratorial conduct on the part of physicians aiming to conceal their culpability for a patient death while the clock runs out. This, she argues, would invite plaintiffs prospectively to sue indiscriminately any physician who treated the decedent in any way that might be connected to the events leading to death, in direct contravention of the legislature's intention to discourage frivolous or overbroad malpractice suits.

For his part, Dr. Conaboy suggests that the Superior Court's view leads to an untenable, indefinite extension of the time during which any number of physicians and their insurers will dangle in limbo regarding their potential liability exposure, owing not only to the prospect of delay but to questions pertaining to how attenuated the medical chain of causation might grow.[58] Long-delayed suits would remain available indefinitely

---

without worrying that they will be summoned into court and possibly subjected to civil liability for events occurring some time ago.").

[57] Justice Mundy's observation that an equitable tolling exception creates actuarial uncertainty, regardless of how we interpret the statute, is true as far as it goes. *See* Conc. & Diss. Op. at 8 (Mundy, J.). The very idea of pooling risk that animates the insurance industry makes no sense absent uncertainty. But to observe that no interpretation will eliminate uncertainty entirely tells us nothing about the degree or duration of such uncertainty. Our view of the statute decreases the number and duration of lingering malpractice claims while imposing nothing more upon survivors than the time-honored duty of diligent inquiry.

[58] MCARE was enacted with a seven-year statute of repose that, presumably, was intended to preclude such suits after seven years, regardless of when the injury or the concealment of the cause of death was discovered. *See* 40 P.S. § 1303.513(a). This Court deemed the statute of repose unconstitutional in *Yanakos v. UPMC*, 218 A.3d 1214 (Pa. 2019), and the General Assembly has yet to enact a substitute provision. Thus, there remains no statutory limit of any kind upon delayed suits.

to any plaintiff who contends, however tenuously, that a treating physician concealed a potential legal cause of death such that a duly diligent plaintiff—through no fault of his or her own—remained unable to identify an available claim or promising line of inquiry. This path would require only the bare showing necessary to establish a disputed issue of fact, the low bar for which is evident in the Superior Court's decision to remand this case for further examination of the tolling claims based upon Reibenstein's conclusory allegations of misconduct, allegations that the trial court roundly rejected for want of supporting evidence.[59] This necessarily enmeshes physicians in a quagmire that agglomerates determination of medical cause of death, unquestionably their province, with identification of potential legal causes of death, which is more properly entrusted to the legal system.[60]

We do not reject entirely the salience of Reibenstein's claim that limiting the tolling provision to medical causation will force plaintiffs to cast their nets more widely in determining whom to sue. But while a plaintiff may at least begin suit against a bevy of health care providers with writs of summons, the certificate of merit requirement will nip unsubstantiated threats in the bud, as it evidently did in this case, when Reibenstein was unable to obtain a certificate of merit against Dr. Conaboy early in this litigation. Plaintiffs will have an opportunity to conduct timely, rigorous investigations of potential malpractice actions arising from fatal events, in keeping with MCARE's objective.

---

[59] *See* T.C.O. at 4.

[60] *See* Conaboy's Br. at 17 ("[T]he Superior Court discarded the established medical procedures for stating *what* caused death in the death certificate—*i.e.,* the medical explanation of the order, type, and association of physiological events resulting in death—and substituted an examination of *who* caused [Decedent's] accidental death.") (emphasis in original).

Reibenstein also does not account for the availability of pre-complaint discovery. Since 2007, the Pennsylvania Rules of Civil Procedure have provided for discovery in furtherance of preparing a complaint, a mechanism that Reibenstein apparently did not explore in this case. Pursuant to Rule 4003.8, which was adopted in the wake of our decision in *McNeil v. Jordan*,[61] "[a] plaintiff may obtain pre-complaint discovery where the information sought is material and necessary to the filing of the complaint and the discovery will not cause unreasonable annoyance, embarrassment, oppression, burden or expense to any person or party."[62] This general rule is bolstered by companion provisions in Pennsylvania Rules of Civil Procedure 4001(c), 4005(a), and 4007(c), which collectively provide for pre-complaint interrogatories and depositions. Reibenstein could not have ruled out the prospect that the trial court in its discretion would allow her to seek such discovery.[63] It would be unreasonable to deny Dr. Conaboy the benefit of MCARE's statute of limitations merely because Reibenstein failed to investigate Dr. Conaboy's putative role in Decedent's death more diligently.

Reibenstein would have us believe that she never had any chance of identifying Dr. Conaboy as a proper defendant in this action within the limitations period. But the facts and circumstances of this case suggest otherwise. Reibenstein's own complaint indicates that, in the days before Decedent's death, at least three physicians, including

---

[61]    894 A.2d 1260 (Pa. 2006).

[62]    Pa.R.C.P. 4003.8(a).

[63]    Reibenstein herself concedes that "one of the purposes of the well-established Writ of Summons is to afford litigants the opportunity to properly investigate a case even after the statute of limitations has passed." Reibenstein's Br. at 35.

Dr. Conaboy, examined Decedent.[64] Reibenstein clearly was conscious of the possibility of malpractice, and had no reason at the outset to exclude any of the treating physicians from her preliminary investigations. Indeed, she "obtained expert review and opinion regarding the medical care and treatment provided by <u>all</u> health care professionals identified in [her medical] records."[65] It is true, as Reibenstein emphasizes, that she could not file a complaint against Dr. Conaboy (or any provider) without first securing a certificate of merit, and Reibenstein asserts that she sought one unsuccessfully. But this tells us nothing about the quantum and quality of the information and guidance that she gave her chosen expert, and, in any event, disregards the alternative course of filing a writ of summons and seeking pre-complaint discovery.[66]

Collectively, these considerations leave unclear the reason for the slow progress of Reibenstein's investigation; indeed, they highlight what perhaps should have been perceived as urgency.[67] Among other things, we do not know why so much time passed

---

[64] *See* Complaint at 2-5.

[65] Reibenstein's Br. at 5 (citing 231 Pa. Code Rule 1042.3 (setting forth MCARE's certificate of merit requirement)) (emphasis in original).

[66] It also confounds the persistent undertone of Reibenstein's argument that she lacked cause to investigate Dr. Conaboy until she took Dr. Barax's deposition.

[67] We highlight these concerns to rebut the overarching theme of Reibenstein's argument that this case exemplifies the sort of putative injustice that will follow from a narrow understanding of the term "cause of death." While the exceptions that the statute affords to the two-year limitations period are explicitly narrow, and the burden of establishing those exceptions is weighty, the effect is by no means draconian, especially when evaluated in light of the competing interest in finality. *See Fine*, 870 A.2d at 860 ("The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence."). What is more, the "fraudulent concealment" exception is not limited to affirmative conduct, inasmuch as "defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud

between the filing of the complaint against Dr. Barax and the conclusion of discovery. However resistant Dr. Barax may have been, the passage of time was substantial, which may suggest relative inaction and delay, given what Reibenstein alleges was a flagrant pattern of obstruction of discovery. One would expect a zealous attorney to seek judicial intercession when confronted with persistent obduracy, and our law requires nothing less.[68] It is incongruous at best that Reibenstein humored delay in scheduling the deposition for years before seeking court intervention, especially after she had filed a

---

or concealment is sufficient." *Molineaux*, 532 A.2d at 794 (citing *Walters v. Ditzler*, 227 A.2d 833 (Pa. 1967); *Nesbitt v. Erie Coach Co.*, 204 A.2d 473 (Pa. 1964)).

[68] *See Fine*, 870 A.2d at 860-61. Instead of addressing her evidently years-long inaction except in the vaguest of ways, Reibenstein alleges fraudulent and conspiratorial concealment and misrepresentation by either or both of Dr. Conaboy and Dr. Barax. But she supports these accusations with, at best, highly attenuated circumstantial evidence. The trial court expressly rejected Reibenstein's aspersions as unsubstantiated, a conclusion that we have no cause to question and that we need not review. *See* T.C.O. at 4 (quoting 40 Pa.C.S. § 1303.513(d))("Applying the law to the facts it is clear there is no evidence of affirmative misrepresentation or fraudulent concealment of the cause of death."). Reibenstein, undeterred, continues to level these accusations before this Court, commencing oral argument before this Court not with legal analysis but by attacking Dr. Conaboy's and Dr. Barax's integrity:

> One thing is clear beyond a reasonable doubt on this record before you: A physician licensed to practice medicine in the state of Pennsylvania raised his right hand and lied under oath in an attempt to avoid the consequences of killing one of their patients. . . . [A] second doctor also lied and/or conspired with that first doctor to also hide the malpractice that had occurred.

Oral Argument, *Reibenstein v. Barax*, 10/26/2021, at 36:50, *available at* https://www.youtube.com/watch?v=hkCzYtvSU2U; *cf. id.* at 47:25 ("I'm not convinced there wasn't a conspiracy here."). It is by no means clear whether the late discovery of the information upon which Reibenstein would rely in seeking to hold Dr. Conaboy liable was the product of deliberate individual or concerted actions by Dr. Barax or Dr. Conaboy or something else entirely. The mere fact of inconsistent sworn testimony does not prove prevarication. More importantly, this Court is not the venue in which to litigate such matters.

motion to compel at a much earlier stage upon encountering similar resistance in response to her written discovery requests.[69]

Ultimately, the statute requires what it requires. The phrase "cause of death" as used in MCARE Section 513(d) refers specifically to the medical cause of death. Only an affirmative misrepresentation or fraudulent concealment of such medical cause of death will toll the two-year statute of limitations that MCARE prescribes for medical malpractice claims sounding in survival or wrongful death.[70]

---

[69]    Notably, in *Molineaux*, *supra*, this Court declined to find sufficient concealment to toll the statute of limitations where the defendant hospital's delay in divulging important records was a consequence of an error of form in counsel's request.

[70]    Justice Dougherty's Concurring and Dissenting Opinion comprises almost exclusively observations establishing the uncontroversial proposition—acknowledged above at length—that the Section 513(d) statute of limitation for death cases, which is tolled only in the event of fraudulent concealment, differs from the discovery rule, which tolls the limitations period for negligence cases involving non-fatal injuries. *See* Conc. & Diss. Op. at 2-6 (Dougherty, J.). As we explain above, death and non-death cases differ only in two ways, neither of which precludes drawing a useful analogy between them. *See generally supra* at 17-20. The first way they differ is that, in wrongful death cases, death itself has been deemed sufficient to put a would-be plaintiff on inquiry notice of the prospect of wrongdoing and to commence the running of the statute of limitations. In non-death cases, by contrast, inquiry notice and the running of the statute of limitations occurs when an injury was or could have been discovered by the plaintiff after diligent investigation. The second distinction, which follows from the qualitative difference between death and injury that underlies the first, arises because the discovery rule must address a wider array of obscuring circumstances that might, in the interests of fairness, reasonably warrant its application, while the limitations period in death cases warrants tolling only when fraudulent concealment or affirmative misrepresentation obscures the *cause* of death and leads a would-be plaintiff to rest rather than investigate the circumstances of the death—or perhaps prompt an expert or attorney to decline a case that he or she might examined more closely if the medical cause of death had been accurately recorded, Our point is that the respective doctrines serve the same core purpose, for the same general reasons, and do so by the same mechanism—the tolling of the statute of limitations, whether for equitable or statutory reasons. Both, that is to say, reflect the judgment that when even diligent inquiry is confounded, relief from the statute of limitations is due. This analogy between the case law that preceded MCARE § 513's enactment, as informed both by discovery rule and death cases that addressed tolling, arguably supports the narrow construction of "cause of death" that the statutory

We reverse the Superior Court's contrary ruling, and we remand for restoration of the trial court's grant of summary judgment in Dr. Conaboy's favor.

Chief Justice Todd and Justice Brobson join the opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Mundy files a concurring and dissenting opinion in which Justice Dougherty joins.

Justice Donohue did not participate in the consideration or decision of this matter.

---

language itself requires. Notably, Justice Dougherty does not confront the point upon which we disagree directly: *why*, strictly as a matter of statutory interpretation, MCARE's use of the phrase "cause of death" necessarily incorporates both medical and legal cause of death. In this regard, he merely reiterates Justice Mundy's observation that the narrower view will result in fewer plaintiffs benefitting from equitable tolling, which is likely correct. *See* Conc. & Diss. Op. at 7 (Dougherty, J.); Conc. & Diss. Op. at 7-8 (Mundy, J.). Be that as it may, this consequence reveals nothing more than a policy preference that the legislature implied in drafting Section 513(d), a preference that is not ours to displace.